AO 91 (Rev. 01/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Western District of Texas

**SEALED**

Filed 7-1-11
Clerk, U. S. District Court
Western District of Texas
By _____ Deputy

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| MAURICIO SANCHEZ-GARZA, | ) | Case No.  SA-11-568M(1)(2) |
| ALEJANDRO SANCHEZ-GARZA, | ) | |
| *Defendant* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of __1/16/10__ in the county of __BEXAR__ in the __WESTERN__ District of __TEXAS__, the defendant violated __18__ U. S. C. § __1956__, an offense described as follows:

CONSPIRACY AND ATTEMPT TO LAUNDER MONETARY INSTRUMENTS

PENALTY: UP TO 20 YEARS IMPRISONMENT, UP TO $250,000 FINE, UP TO 3 YEARS OF SUPERVISED RELEASE, MANDATORY $100 ASSESSMENT

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT

✓ Continued on the attached sheet.

_____
*Complainant's signature*

SPECIAL AGENT STEPHEN A. PARKINSON, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/1/2011

_____
*Judge's signature*

City and state:  SAN ANTONIO, TEXAS        PAMELA A. MATHY, U.S. MAGISTRATE JUDGE
*Printed name and title*

**AFFIDVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT**

I, Stephen A. Parkinson, being duly sworn, depose and state:

1. I am an Investigative or Law Enforcement Officer of the United States within the meaning of Title 18, United States Code, and Section 2510(7), that is, an Officer of the United States who is empowered to conduct investigations of and to make arrests for the offenses enumerated in Title 18, United States Code, and Section 2516.

2. I have been employed as a Special Agent with the United States Drug Enforcement Administration ("DEA") since January, 1997. I am currently assigned to the San Antonio DEA District Office.

3. In connection with my official DEA duties, I investigate criminal violations of federal drug laws and related offenses, including, but not limited to, violations of Title 21, United States Code, Sections 841, 843, 846, 848, 856, 952, 690, and 963, and Title 18, United States Code, Sections 1952, 1956, and 1957. I have received specialized training in the enforcement of the drug laws, the investigation of drug trafficking and drug organizations, in drug recognition and terminology, undercover operations, interviewing techniques, financial/money laundering investigations, and the use of electronic surveillance.

4. I have participated in complex investigations concerning the unlawful importation, possession with intent to distribute, and distribution of controlled substances, use of communication

1

facilities to cause or facilitate the distribution of controlled substances, and conspiracy to commit such offenses, in violation of Title 21, United States Code, Sections 952, 960 841(a)(1), 843(b), 846, and 963, and the laundering of monetary instruments, in violation of Title 18, United States Code, Section 1956 and 1957.

5. An individual who is cooperating (CS) with the DEA was interviewed reference to an attempted money laundering transaction in early 2010. During 2009, the CS was approached by Mauricio Sanchez-Garza about locating investment money for his projects in Mexico. The CS knew a person in Saltillo, Mexico, identified as Oscar Vazquez Rodriguez (Oscar), who loaned drug money to people for a 5-10% commission. The CS first met Oscar Vazquez Rodriguez approximately 18 months earlier in Mexico. The CS was told that Oscar was a loan shark who was involved with "dirty" people. The CS' first impression of Oscar was that he was a narcotics trafficker. The CS met Oscar on 5 or 6 other occasions during which Oscar told the CS that he was a loan shark who loaned Mexico Pesos and U.S. dollars for a 5-10% commission. Oscar told The CS that the money he loaned belonged to Chapo Guzman and that Oscar worked for him. Mauricio Sanchez-Garza wanted $40 million in capital to develop a real estate project in Acapulco, Mexico and to make private loans to people for a commission. The CS asked Oscar if he was interested in loaning money to Mauricio Sanchez-Garza. Oscar told the CS that the money was currency located in the U.S.

2

The CS offered for Oscar to meet Mauricio Sanchez-Garza in Guadalajara to facilitate the $40 million transaction for The CS's commission of 2%. During mid 2009, Mauricio Sanchez-Garza flew to Saltillo in his private jet to pick up Oscar and then flew him to Guadalajara to view the property in Acapulco, which was worth over $40 million, and other Sanchez-Garza properties in Guadalajara, identified as the family ranch, to be used as collateral. The CS knew that an agreement would have been put in place between Mauricio Sanchez-Garza and Oscar providing that in the event Mauricio Sanchez-Garza defaulted on the loan, Oscar would retain ownership of the Acapulco property. The deal would be for the purpose of Oscar laundering the drug proceeds of Chapo Guzman into a legitimate investment. The terms of the deal between Mauricio Sanchez-Garza and Oscar were never finalized. After Mauricio Sanchez-Garza met with Oscar, Mauricio Sanchez-Garza returned to the U.S. and told the CS that Oscar said the money was from Chapo GUZMAN and asked if the CS could confirm. The CS told Sanchez-Garza that the CS only knew that Oscar loans money in Mexico. Over the next several month negotiations continued between Mauricio Sanchez-Garza Oscar. During these negotiations, the CS learned that Mauricio Sanchez-Garza questioned if Oscar would be able to produce the money. When Oscar offered to take Mauricio Sanchez-Garza directly to Chapo Guzman, and Mauricio Sanchez became scared and did not want to meet with Chapo Guzman.

6. According to the CS, during January of 2010, Mauricio coordinated with Oscar for the delivery of several million dollars in drug proceeds to Mauricio Sanchez-Garza in San Antonio. Oscar made it clear that the transfer would be between Oscar and Mauricio Sanchez-Garza, and the CS would not be present. The CS knew that Mauricio Sanchez-Garza was going to make arrangements to transport the bulk money back to Mexico. Oscar mentioned that money was in California but said he would deliver it to San Antonio. The CS believes that there were to be additional transfers of money in the U.S. and a commission would be paid by Mauricio Sanchez-Garza to the CS. The transaction never was consummated.

7. During January 2010, DEA San Antonio agents monitored court authorized interceptions of telephone calls between Mauricio Sanchez-Garza, Oscar Vazquez Rodriguez (Oscar), Alejandro SANCHEZ-Garza, a San Antonio business/money broker, and others, coordinating the delivery and transportation of multi-million dollar quantities of narcotics-related proceeds from Oscar to Mauricio and Alejandro Sanchez-Garza in San Antonio on or around January 17, 2010 that would subsequently be transported to Mexico. Agents intercepted calls between Mauricio Sanchez-Garza and Alejandro Sanchez-Garza discussing the delivery of the money in San Antonio. During those telephone calls, Alejandro Sanchez-Garza arranged to have a Lear 31 jet, tail number XA-JYC, fly from Guadalajara, Mexico to San Antonio to facilitate the receipt and

4

transportation of U.S. currency from the United States to Mexico. Summaries of those conversations are as follows:

a) On 1/16/10 at approximately 5:42 p.m., Mauricio Sanchez-Garza received an incoming call from Alejandro Sanchez-Garza. During that conversation, Mauricio Sanchez-Garza told Alejandro Sanchez-Garza that he called the guy (Oscar) and that he is already over here and would see Mauricio Sanchez-Garza tomorrow (1/17/10). (Surveillance established that Mauricio Sanchez-Garza was in San Antonio at the time of this conversation). Mauricio Sanchez-Garza asked Alejandro Sanchez-Garza what he wanted to do. Alejandro Sanchez-Garza said that he spoke to Claudia to be ready tomorrow morning (1/17/10) and he would be leaving very early. Claudia Minicata has been identified in this investigation as the administrator for the Lear 31 jet. She is employed by the Sanchez-Garza family in Guadalajara.

b) On 1/16/10 at approximately 5:44 p.m., Mauricio Sanchez-Garza received another incoming call from Alejandro Sanchez-Garza. During that conversation, Mauricio Sanchez-Garza said that the guy (Oscar) told him that he was very close and would see Mauricio Sanchez-Garza tomorrow (1/17/10). Alejandro Sanchez-Garza told Mauricio Sanchez-Garza to ask the guy (Oscar) if he was there so that Mauricio Sanchez-Garza's brother (Alejandro Sanchez-Garza) can go ahead and come. Alejandro Sanchez-Garza said that they would go ahead and leave or leave sooner if they had to.

5

c) On 1/17/10, as per records of the Treasury Enforcement and Customs System (TECS), a proposed flight plan was filed for Lear 31 (XA-JYC) from Guadalajara, Mexico to San Antonio, Texas with an estimated time of arrival of 2:30 p.m. The manifest included pilots David Nevarez and Jovani Montoya; and passengers Alejandro Sanchez-Garza, Diego Sanchez-Garza, and Jose Luis Velaquez. During subsequent intercepted calls between Mauricio Sanchez-Garza and Oscar, it was determined that the delivery of the narcotics-related proceeds to Mauricio Sanchez-Garza was being delayed.

d) On January 17, 2010, Mauricio Sanchez-Garza spoke with Oscar. Oscar indicated they had just arrived in San Antonio. When Mauricio Sanchez-Garza asked Oscar if he wished to meet for dinner, Oscar stated that he was in possession of "things" that he could not leave "unattended". The following day, Mauricio Sanchez-Garza spoke again with Oscar. During multiple conversations on that date, the parties arranged to meet with one another and discussed whether it was "safe to talk". Oscar stated that he could not reveal his locations for "mutual safety" reasons because he had "delicate things" with him. Again on January 21, 2010, Oscar and Mauricio Sanchez-Garza discussed meeting with one another. Oscar emphasized that the number of persons at the meeting would be limited because "what we're going to handle is something very delicate".

8. Court authorized interceptions of telephone conversations

6

further revealed that Mauricio Sanchez-Garza communicated this information to his brother Alejandro Sanchez-Garza. On 1/19/10, in furtherance of this transaction, Alejandro Sanchez-Garza and Jose Luis Velazquez arrived in San Antonio on board a commercial air carrier. While in San Antonio, Alejandro Sanchez-Garza remained in telephonic contact with Mauricio Sanchez-Garza regarding updates on the status of the currency delivery from Oscar. Alejandro Sanchez-Garza and Jose Luis Velazquez remained in the U.S. until it they realized that the transaction was not going to occur.

I believe the above demonstrates that Mauricio Sanchez-Garza, Alejandro Sanchez-Garza, and others conspired to launder monetary instruments and attempted the laundering of monetary instruments.

                                    _____
                                    STEPHEN A. PARKINSON, DEA

Sworn to and subscribed before me on the ___1st___ day of July, 2011.

                                    _____
                                    PAMELA A. MATHY
                                    United States Magistrate Judge

7